JOHNNY CAESAR, *alias* WILLIE GENTRY, v. THE STATE.

No. 20116. Delivered February 1, 1939.
Rehearing Denied March 8, 1939.

The opinion states the case.

*Jules F. Mayer,* of Dallas, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The conviction is for murder; penalty assessed at death.

The indictment alleges that the appellant, with malice aforethough, killed Corrine Allen by cutting and chopping her with an ax.

From the testimony of Johnny Cook, an eye-witness to the tragedy, we take the following quotation:

"Along about 8 o'clock on the afternoon of the 17th of May, 1936, I was there and Johnny Caesar and Fleet Wallace and Corrine Allen were also there. A little earlier two old fellows had stopped by there. Otis Hunter had also been by there. I was staying there because I had female trouble and the Doctor forbid me going up and down steps and I was in bed and Fleet Wallace was standing there by the foot of my bed with his hands stretched out like this. During the evening he was sitting down by the door and during that time Corrine Allen was in the kitchen fixing something to eat. I then heard Corrine Allen tell Johnny Caesar she was going down to her uncle's house and he said, 'You are not going any place,' and she said she was and he said, 'You are not going any place,' and she said, 'I can go see my people if I want to, and I don't keep you from going to see your people.' Her uncle lived down on Boll about five or six blocks from where this house was. When she told him she was going down to her uncle's house she reached up on the wall and got a dress and took it in the kitchen and Johnny Caesar told her she wasn't going to her uncle's and then he went out of the front door and was gone somewhere about thirty minutes and came back in the house, and when he came back he had his hand down like this and when he turned

around he had an ax in his hand. At that time Fleet Wallace was standing right at the foot of my bed. I saw the ax in his hand. I said to Johnny, 'Don't do that,' and he told me not to come up on him or he would knock my damned brains out. Corrine came to the middle door and didn't have anything in her hands, and Fleet was standing at the foot of the bed not doing anything, and when Corrine came to the door Johnny Caesar whirled from me and hit Corrine with the ax and she fell down by the side of the door like that. Corrine didn't have anything in her hands when he hit her and hadn't put on her dress and didn't go after he told her she couldn't go. I seen him hit Corrine with the iron part of the ax, one time before I ran out of the house. Fleet Wallace hadn't had anything in his hands when I last saw him. There hadn't been any kind of argument all that day other than about the dress."

On cross-examination the witness testified: "Corrine Allen didn't have anything in her hands but her dress when she went in the kitchen and she didn't have anything inside the dress."

V. S. Smart, a city detective of Dallas, testified that about nine o'clock (P. M.) he answered a call to a servant's house in the rear of 1411 Cockrell Street. The first thing he saw was a dead negro man lying in the doorway, about half on the porch and half in the house. His head was all beaten up, chopped in and bleeding. The officer then went in the house and saw blood and bits of brains on the ceiling and on the walls. Upon going into a little kitchen he saw Corrine Allen, who was also dead. According to the officer:

"She was knocked through the bottom of a chair sitting on the floor. The chair broke and she went on through. Her head had fallen over and she was facing the alley. Her head was all beat in and had a big gash in it where she had been hit with the blade of the ax and back of the ax; and there was blood running down on the floor and on the walls. * * * There was a cut place on the door leading into the kitchen. I also saw what looked to be little parts of brain and hair on the wall. * * * The blade of the ax was pretty close to Fleet Wallace and the handle was back a little farther. When I saw the ax it had blood all over it on the blade. * * * The handle was broken like that when I first saw it. * * * Corrine Allen didn't have any kind of weapon on her. The ax is the only weapon I saw. I was present when the body of Fleet Wallace was searched and there was no weapon of any kind on him."

The officer testified that there were some glasses on the table which looked like ice tea glasses. He smelled the contents

of the glasses but there was no whisky odor in them. According to the witness, "the stuff in the glasses looked like ice tea."

Jack Archer, another city detective, testified that on the night of the alleged homicide, he went to the rear of 1411 Cockrell Street, where the tragedy occurred. Upon his arrival at the place mentioned he found two dead persons. The body of Corrine Allen was in a chair. The seat of the chair was split in half and the chair was mashed down to the floor. She was slumped down in the chair with her feet sticking out in front. The officer examined the heads of the two bodies. Corrine Allen had five or six bruised places in her head. There were several holes in the back of Fleet Wallace's head, and his forehead was mashed in. The officer made a search for weapons but failed to find any. Neither did he find any ice pick. On re-direct examination the officer testified that he saw one or two glasses on the table and one lying tipped over on the floor near the front of the woman's body; that he smelled the glasses but failed to detect the odor of liquor in them. The witness testified that he took charge of the ax with which the offense was committed; that when he found it the handle was broken; that there was fresh blood all over the blade of the ax at the time it was found.

Sam Sutherland testified that he lived at 1411 Cockrell Street in the city of Dallas and that he rented the servant's house in the back of the place to Corrine Allen, who had been living there for quite a while. He never collected any rent from the appellant. About nine o'clock on the night of May 17, 1936, his attention was attracted by the screaming of a woman which came from the servant's house. He then heard ten or fifteen licks in fairly rapid succession which sounded "just like hitting on an animal with some kind of an instrument." He also heard a man's voice using curse words. After the last blow the witness got in a position where he could see a "black person leaving the premises." According to the best judgment of the witness, the appellant was the man seen running from the place. After the killing the witness went into the house. He saw a woman "crunched down" in the only chair that was broken. There were six or eight bruises on her head and a puddle of blood down at her feet. The head of Fleet Wallace had been beaten up in "such jelly form" that one could hardly tell how many licks had been hit on his head. The witness saw no knife in the hands of Wallace or on the floor. Neither did he see any ice pick on the floor. There were some glasses which had had liquid in them, but they contained no odor of liquor.

Upon being recalled by the State, Sutherland testified that he had seen the ax with which the homicide was committed; that it "would be by the corner of the porch next to the little wood shed on the outside."

The appellant testified that he was twenty-nine years of age; that he first met the deceased, Corrine Allen, in 1929; that they started living together in 1933 or 1934; that he left Dallas and went to Lockhart, but returned in 1936; that he and the deceased had been living together as man and wife since May, 1936, although no marriage ceremony had ever been performed. Appellant testified that he knew Fleet Wallace, and had seen him often at the home of the deceased. About noon of the day on which the tragedy occurred, the deceased gave him (appellant) fifty cents and asked him to purchase some whisky. He made several attempts to get some whisky but was unable to do so. When he returned about three o'clock in the afternoon the deceased gave the money to Fleet Wallace and asked him to purchase some whisky. When he returned, the parties present drank the whisky except the appellant. He reprimanded the deceased for drinking and dancing with Fleet Wallace. According to the appellant, the deceased and Wallace started to leave the house and he told her she was not going; that Wallace then said: "Hell, nigger, you ain't got a damned thing to do with what she does." From the appellant's testimony we quote:

"I just sat there in a corner for a while and got up and walked over toward the door, and she went in the kitchen and I thought may be she went after the ice pick; and I started toward her and he hauled off and hit me and knocked me down with a chair and fell on top of me and commenced beating me up and said, 'I am going to get rid of you now,' and I thought he was going to kill me. I didn't have any kind of weapon in my hand, and then Corrine grabbed the ax and hit at me while I was on the floor, and I managed to duck the lick and twisted around, and I was scared, and I got up and got hold of the ax and done a clean-up; I left. When Corrine came in and grabbed the ax I didn't have nothing and she said, 'God damn it, I have got it in for you; I have been wanting to get hold of you anyhow. 'She told Fleet Wallace to 'Hold him down,' and said, 'God damn it, I will fix him'; and she drew back and hit at me and I managed to twist around and she missed me and I got out from under Fleet and shoved him away and grabbed the ax away from her, and I kind of hit her and then she fell, and he was coming

toward me and I shoved him again and he hit. * * * After that happened I grabbed what things I had and I went to the Interurban."

Appellant testified that he ran off after the killing because he was scared and did not know what else to do. On cross-examination the appellant testified:

"I admit I killed Corrine Allen with an ax; I killed Fleet Wallace with the same ax. When Corrine Allen went after this ice pick she was pretty near in the house coming out of the door, but I don't know whether she got one or not. I don't know exactly where they fell out at when I killed them. I don't know just what she was doing when I first started hitting her with the ax. I got cut. I guess Fleet Wallace had a knife. I don't know how else I would get cut if he didn't have a knife. After I knew I had cleaned up, and went ahead and got my things and ran."

When recalled for further examination the appellant testified:

"I didn't see Corrine Allen with any ice pick in her hand that night. I didn't see any ice pick or knife in Fleet Wallace's hands. I remember seeing Corrine with an ax in her hand. I didn't own an ice pick or a knife or a gun."

Appellant was finally arrested in California where he had fled after the killing.

Appellant introduced three witnesses for whom he had worked at various times. The purpose of their testimony was to prove that he was a peaceable negro and that he had a good reputation.

In the absence of bills of exception, the only question presented for review is the sufficiency of the evidence to support the conviction. In view of the extreme penalty assessed against the appellant, we have set out the testimony at some length.

The rights of the appellant were fully protected by the charge of the court against which no objections were addressed. Adequate instructions were given to the jury upon the law of communicated threats and self-defense as applied to assault by both of the deceased, namely, Corrine Allen and Fleet Wallace. The issues of fact presented by the evidence were resolved in favor of the State by the verdict of the jury which is sanctioned by the trial judge and is binding upon this court.

Deeming the evidence sufficient to support the conviction

and finding no error upon which to base a reversal, the judgment is affirmed.

ON MOTION FOR REHEARING.

GRAVES, JUDGE.—Appellant complains in his motion because the court failed to charge the law on self-defense, as raised by appellant's testimony. A perusal of the court's charge shows that the court did charge on appellant's right to defend himself not only against the acts of and appearance of danger from Corrine Allen, the deceased, but also from the acts of and appearance of danger from Fleet Wallace, the other person whom appellant killed at such time. The trial court also charged upon the law of threats as applied to both parties who were killed at such time by appellant. The charge seems to have properly safeguarded appellant's rights, and was a liberal though proper one.

Appellant for the first time in this motion complains because of the fact that no colored person was on the grand jury that indicted this appellant, nor on the petit jury that tried him, and that he was, therefore, discriminated against in violation of his rights as guaranteed under the Constitution of the United States. There is no testimony evidencing this discrimination, and no motion to quash the indictment nor the jury panel, and we have nothing to call the same to our attention save such a statement in the motion for rehearing, hence we cannot further consider such matter.

The facts herein reveal a brutal murder of a defenseless woman, with a ferocity virtually unbelievable; an evidence of a degree of malice seldom evidenced by a human being. The jury in their discretion saw fit to exact the extreme penalty herein, and it does not lie within our province to say they were not correct.

Believing that appellant has received a fair trial, and that he was accorded all his rights therein, this motion for a rehearing will be overruled.